**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| | : | |
| | : | |
| | : | |
| AMY COOPER | : | Civil Action No.: |
| | : | 1:21-cv-04692-RA |
| Plaintiff, | : | |
| | : | |
| v. | : | **AMENDED COMPLAINT WITH** |
| | : | **JURY DEMAND** |
| FRANKLIN TEMPLETON, FRANKLIN | : | |
| TEMPLETON INVESTMENTS, FRANKLIN | : | |
| RESOURCES, INC., FRANKLIN TEMPLETON | : | |
| COMPANIES, LLC, JENNY JOHNSON, | : | |
| FRANKLIN TEMPLETON CORPS. XYZ 1-10, | : | |
| JOHN DOES and/or JANE DOES 1-10, | | |
| | | |
| Defendants. | | |

Plaintiff Amy Cooper ("Plaintiff"), by her attorneys Law Office of Andrea Paparella, PLLC and Litt Law, PC alleges as follows against Franklin Templeton, Franklin Templeton Investments, Franklin Resources, Inc., Franklin Templeton Companies, LLC, Jenny Johnson, Franklin Templeton Corps. XYZ 1-10, John Does and/or Jane Does 1-10 (collectively "Franklin Templeton" or "Defendants"):

<u>SUMMARY</u>

1. On May 25, 2020, Plaintiff was confronted in Central Park by Christian Cooper while walking her dog alone. This confrontation became international news as a racial flashpoint, characterized as a privileged white female "Karen" caught on video verbally abusing an African American male with no possible reason other than the color of his skin.

2. This characterization was created and nurtured, in whole or in part, by the public statements published by the Defendants to millions of people reporting that it had: a)

performed a legitimate investigation into its employee and the events of May 25, 2020, b) that the legitimate investigation determined indisputably that Plaintiff was a racist, and c) that due to the results of their legitimate investigation, the Plaintiff's employment with the Defendants was terminated.

3.  Franklin Templeton's alleged investigation and results provided legitimacy to the "Karen" story, and appeared to provide justification for those who sought the destruction of the Plaintiff's life.

4.  But the Defendants never performed an investigation into the confrontation between Plaintiff and Christian Cooper in Central Park on May 25, 2020.

5.  Even a perfunctory investigation would have shown that Plaintiff did not shout at Christian Cooper or call the police from Central Park on May 25, 2020 because she was a racist -- she did these things because she was alone in the park and frightened to death after being selected as the next target of Christian Cooper, an overzealous birdwatcher engaged in Central Park's ongoing feud between birdwatchers and dog owners.

6.  Christian Cooper was a birdwatcher with a history of aggressively confronting dog owners in Central Park who walked their dogs without a leash. It was Christian Cooper's practice and intent to cause dog owners to be fearful for their safety and the safety of their dogs, and he had a history of doing so to people, including to one African American man who wrote national media stating: "when I saw that video, I thought, I cannot imagine if he approached [Plaintiff] the same way how she may have genuinely been afraid for her life."

7. But Franklin Templeton perpetuated and legitimized the story of "Karen" vs. an innocent African American to its perceived advantage, with reckless disregard for the destruction of Plaintiff's life in the process.

## FACTUAL BACKGROUND

### a. The Defendants' Statements

8. On May 25, 2020, Franklin Templeton published a statement on Twitter about the Central Park incident stating:

> We take these matters very seriously, and we do not condone racism of any kind. While we are in the process of investigating the situation, the employee involved has been put on administrative leave.

9. On May 26, 2020 at or around 2:24 p.m., Franklin Templeton published another statement on Twitter announcing that they performed an "internal review" of the Central Park incident.

10. The May 26, 2020 statement announced that Franklin Templeton terminated Plaintiff's employment as a result of the Defendants' internal review.

11. The May 26, 2020 statement announced that Franklin Templeton "do(es) not tolerate racism of any kind."

12. The May 26, 2020 statement on Twitter was "liked" by over 277,000 people, and seen by countless more.

13. The public to whom Franklin Templeton published the May 26, 2020 statement knew and understood that the subject of Franklin Templeton's statement was Plaintiff.

14. The May 26, 2020 statement was intended to, and had the effect of, conveying that Franklin Templeton had performed a thorough and fair investigation, and that the result of the investigation was the conclusion that Plaintiff was a racist.

15. On June 2, 2020, the President and CEO of Franklin Templeton, Jenny Johnson, participated in a Bloomberg video interview and answered questions exclusively about the Defendants' termination of Plaintiff's employment.

16. During the June 2, 2020 Bloomberg interview, Jenny Johnson stated that the facts of this matter were fully reviewed prior to the Defendants' decision to terminate Plaintiff's employment.

17. During the June 2, 2020 Bloomberg interview, Jenny Johnson stated that Franklin Templeton terminated Plaintiff's employment because "the facts were undisputed in this case."

18. Among other internet locations, the June 2, 2020 Bloomberg interview has been publicly available on www.Bloomberg.com from June 2, 2020 through the present.

19. The Defendants intended the June 2, 2020 Bloomberg interview to be widely seen by the public.

20. The June 2, 2020 Bloomberg interview was intended to, and had the effect of, conveying that a thorough and fair investigation had been performed by Franklin Templeton, and that

the result of the investigation concluded that the "facts were undisputed" that Plaintiff was a racist.

21. On July 6, 2020, the President and CEO of Franklin Templeton, Jenny Johnson, participated in a video interview with Fortune Magazine.

22. During the July 6, 2020 interview, Jenny Johnson announced: "[Defendants] espouse zero tolerance for racism."

23. The Defendants intended the July 6, 2020 interview to be widely seen by the public.

24. Among other internet locations, the July 6, 2020 interview has been publicly available on www.Fortune.com from July 6, 2020 through the present.

25. The July 6, 2020 interview was intended to, and had the effect of, conveying that Franklin Templeton had performed a thorough and fair investigation, and that the result of the investigation concluded that Plaintiff was a racist and that is why Franklin Templeton fired her.

26. On July 15, 2021, the President and CEO of Franklin Templeton, Jenny Johnson, participated in a Yahoo! Finance video interview and answered questions about the Defendants' termination of Plaintiff's employment, and contrasted that situation to a second, more recent situation involving a Franklin Templeton employee.

27. The interview has been available on www.finance.yahoo.com from July 15, 2021 through the present.

28. Upon information and belief, the second situation involving a Franklin Templeton employee to which Jenny Johnson referred was Vivek Kudva.

29. Vivek Kudva is an Indian male and a senior executive employed by Franklin Templeton.

30. In June 2021, Vivek Kudva was given a massive fine and a one-year market ban by the Securities and Exchange Board of India for using non-public information to sell approximately $4,000,000 in Franklin Templeton debt funds which were then closed weeks later.

31. Despite this illegality, Franklin Templeton continues to employ Vivek Kudva unabated in his position as the head of Franklin Templeton's Asia Pacific distribution.

32. About Franklin Templeton's handling of the Plaintiff's termination, Jenny Johnson said during her July 15, 2021, Yahoo! Finance video interview: "We felt and we feel confident in the due diligence we did and the process to make our evaluations, our decision."

33.  About Franklin Templeton's handling of the Vivek Kudva situation, Jenny Johnson said during her July 15, 2021, Yahoo! Finance video interview: "[t]he world has gotten to the point where social media comes to very quick decisions without all the facts…and I had this conversation with some employees over an issue recently and my comment to those employees was, here's why social media doesn't have the facts right on this particular situation, and here is why we're going to stand by and I am going to stand by our decision. Because you want to work for a company where the firm has your back. That if people don't get the facts right, the company isn't just going to throw you under the bus."

34. Jenny Johnson's description of Franklin Templeton's handling of the Vivek Kudva matter reveals the Defendants' procedure for the investigation and consideration of discipline in high-profile matters involving Franklin Templeton employees.

### b. The Defendants' "Investigation"

35. Franklin Templeton performed no investigation into the May 25, 2020 incident in Central Park involving Plaintiff.

36. Franklin Templeton's only communication with Plaintiff about the May 25, 2020 incident in Central Park involving the Plaintiff occurred on May 25, 2020 while Plaintiff was palpably distraught and fearful of her safety.

37. Franklin Templeton did not seek to communicate with Plaintiff about the May 25, 2020 incident in Central Park involving Plaintiff except on May 25, 2020 while the Plaintiff was palpably distraught and fearful of her safety.

38. Franklin Templeton did not interview Christian Cooper about the May 25, 2020 incident in Central Park involving Plaintiff.

39. Upon information and belief, Franklin Templeton did not seek to interview Christian Cooper about the May 25, 2020 incident in Central Park involving Plaintiff.

40. If Franklin Templeton had interviewed Christian Cooper about the May 25, 2020 incident in Central Park, it would have learned that Christian Cooper was a birdwatcher with a history of aggressively confronting dog owners in Central Park who walked their dogs without a

leash. It was Christian Cooper's practice and intent to cause dog owners to be fearful for their safety and the safety of their dogs, and he had a history of doing so.

41. Franklin Templeton did not interview relevant persons about the May 25, 2020 incident in Central Park involving Plaintiff.

42. Franklin Templeton did not seek to interview relevant persons about the May 25, 2020 incident in Central Park involving Plaintiff.

43. If Franklin Templeton had interviewed relevant persons about the May 25, 2020 in Central Park involving the Plaintiff, it would have learned that Christian Cooper was a birdwatcher with a history of aggressively confronting dog owners in Central Park who walked their dogs without a leash. It was Christian Cooper's practice and intent to cause dog owners to be fearful for their safety and the safety of their dogs, and he had a history of doing so.

44. Upon information and belief, Franklin Templeton did not obtain Plaintiff's full 911 calls from the New York City Police Department.

45. Upon information and belief, Franklin Templeton did not attempt to obtain Plaintiff's full 911 calls from the New York City Police Department.

46. If Franklin Templeton had performed a proper investigation and obtained Plaintiff's full 911 calls from the New York City Police Department, it would have learned that the Plaintiff reasonably feared for her safety during the May 25, 2020 incident in Central Park because Christian Cooper aggressively confronted the Plaintiff with the intent of causing her to be fearful for her safety and the safety of her dog.

47. Upon information and belief, Franklin Templeton did not investigate what took place between Plaintiff and Christian Cooper prior to Christian Cooper videotaping their interaction on May 25, 2020 in Central Park.

48. If Franklin Templeton had investigated what took place between Plaintiff and Christian Cooper, it would have learned that the Plaintiff reasonably feared for her safety during the May 25, 2020 incident in Central Park because Christian Cooper aggressively confronted the Plaintiff with the intent of causing her to be fearful for her safety and the safety of her dog.

49. Upon information and belief, Franklin Templeton did not obtain minutes from New York City Park Board Meetings pre-dating the May 25, 2020 incident in Central Park involving Plaintiff, which record that Christian Cooper had previously been involved in an altercation in Central Park where, in Christian Cooper's own words, "it has gotten ugly between birders and unleashed dog walkers."

50. Upon information and belief, Franklin Templeton made no attempt to obtain minutes from New York City Park Board Meetings pre-dating the May 25, 2020 incident in Central Park involving Plaintiff, which record that Christian Cooper had previously been involved in an altercation in Central Park where, in Christian Cooper's own words, "it has gotten ugly between birders and unleashed dog walkers."

51. If Franklin Templeton had obtained minutes from the New York City Park Board Meetings, it would have learned that Christian Cooper was a birdwatcher with a history of aggressively confronting dog owners in Central Park who walked their dogs without a leash. It

was Christian Cooper's practice and intent to cause dog owners to be fearful for their safety and the safety of their dogs, and he had a history of doing so.

### c. Jerome Lockett

52. Franklin Templeton did not interview Jerome Lockett or anyone else familiar with Mr. Cooper's past in Central Park to obtain their perspective on the May 25, 2020 incident in Central Park involving Plaintiff.

53. Franklin Templeton did not seek to interview Jerome Lockett or anyone else familiar with Mr. Cooper's past in Central Park to obtain their perspective on the May 25, 2020 incident in Central Park involving Plaintiff.

54. Jerome Lockett identifies as an African American male.

55. Jerome Lockett identifies as a dog owner and resident of New York City.

56. Upon information and belief, Jerome Lockett frequently takes his dog to Central Park for walks.

57. Upon information and belief, prior to the May 25, 2020 incident in Central Park involving Plaintiff, Christian Cooper approached Jerome Lockett aggressively, shouting: "YOU NEED TO LEASH YOUR DOG!!! THEY CAN'T BE OFF-LEASH IN HERE."

58. Upon information and belief, when Jerome Lockett refused to engage Christian Cooper and turned his back to walk away, Christian Cooper escalated his aggression and attempted to lure Jerome Lockett's dog away from Jerome Lockett.

59. Upon information and belief, Christian Cooper said: "if you're gonna do what you want, then I'm gonna do what I want, but you're not gonna like it."

60. Upon information and belief, Christian Cooper had to be physically separated from Jerome Lockett's dog by Jerome Lockett.

61. Upon information and belief, Christian Cooper caused, and intended to cause, Jerome Lockett to feel that he and his dog were the subject of an imminent threat.

62. In his May 26, 2020 statement to media, Jerome Lockett wrote:

> As a black man, I am not scared of another person because their race or ethnicity, but this man IS threatening with his body language and screaming. I don't know Amy Cooper at all, I've said hello to her because that's what dog owners do to other owners in the park, **but when I saw that video, I thought, I cannot imagine if he approached her the same way how she may have genuinely been afraid for her life.** She may not be like me willing to physically defend herself or her dog. I understand the optics of this video aren't great, but people need to understand this man is a dick and probably did threaten her. You can read his Facebook post where he tells the world he told her "you're not gonna like what I'm going to do next." That's a threat. And she has no idea if this man is pulling out a knife, a gun, or a treat that (sic) laced with a rat poison. **If I wasn't who I was, I would of called the police on that guy too.** Sure, we're breaking the rules by having our dogs off leash in a park that has 80% of its area off-leash hours, but **that gives that guy no authority to accost people in such manner.**
>
> **My two fellow dog owners have had similar situations with this man, but don't feel comfortable coming forward because they're white. They think they'll be seen as some "Karen" or whatever.** I obviously don't have that fear. I am a liberal man who voted for Barack, Bernie, and Bernie again. I'll be voting for Biden as he's the lesser of two evils. I'm not some right wing nut job trying to push an agenda. I just think it's unfair and uncool how the world is pushing their own agenda with this story. Not everyone has a personal experience like this so I get it because of the optics, but I beg you guys to please publish my words. **This is not the story we all want.**

(Emphasis added.)

63. Upon information and belief, Christian Cooper initiated the same or a similar series of aggressive actions against other dog owners in Central Park prior to the May 25, 2020 incident in Central Park involving Plaintiff.

64. A full and complete copy of Jerome Lockett's version of these events which he shared with NBCUniversal is annexed hereto as Exhibit "A."

### d. Christian Cooper's Confrontation with Plaintiff

65. On May 25, 2020, Christian Cooper initiated the same or a similar series of aggressive actions as he did against Jerome Lockett and others against Plaintiff, causing Plaintiff to reasonably fear for her safety and the safety of her dog.

66. Plaintiff called the police on May 25, 2020 from Central Park because Christian Cooper's intentionally aggressive actions reasonably caused her to fear for her safety and the safety of her dog, the same or similar as Christian Cooper had done in the past.

67. Plaintiff did not call the police on May 25, 2020 from Central Park because she was a racist.

68. Plaintiff called the police on May 25, 2020 because she reasonably feared for her safety and the safety of her dog after Christian Cooper selected her as the next dog owner he would attack for having a dog off its leash in Central Park.

69. If Defendants had performed an investigation into the May 25, 2020 incident in Central Park involving Plaintiff, they would have known that Plaintiff did not call the police because she was a racist.

70. If Defendants had performed an investigation into the May 25, 2020 incident in Central Park involving Plaintiff, they would have known that Plaintiff reasonably feared for her safety.

71. If Defendants had performed an investigation into the May 25, 2020 incident in Central Park, they would have known that the Plaintiff was selected as another dog owner to be attacked for having a dog off its leash in Central Park.

72. The Defendants knew that they had not performed an investigation into the May 25, 2020 incident in Central Park involving Plaintiff, but nevertheless published statements that they had.

73. The Defendants knew that they had not performed an investigation into the May 25, 2020 incident in Central Park involving Plaintiff concluding that Plaintiff was a racist, but nevertheless published statements that they had.

74. The Defendants knew that they had not performed an investigation into the May 25, 2020 incident in Central Park involving Plaintiff finding that the facts were undisputed that Plaintiff was a racist, but nevertheless published statements that they had.

### e. Plaintiff's Race and Gender

75. According to published statements of the Defendants, an investigation into an allegation(s) of wrongdoing is the standard before determining discipline for a Franklin Templeton employee relating to the alleged wrongdoing.

76. According to published statements of the Defendants, the Defendants understand that "social media comes to very quick decisions without all the facts."

77. According to published statements of the Defendants, the Defendants are "a company where the firm has your back. That if people don't get the facts right, the company isn't just going to throw its employees under the bus."

78. The Defendants did not perform an investigation into the allegations of wrongdoing against the Plaintiff before terminating her employment.

79. The Defendants relied exclusively on social media in its decision to terminate the Plaintiff, despite knowing that "social media comes to very quick decisions without all the facts."

80. The Defendants relied substantially on social media in its decision to terminate the Plaintiff, despite knowing that "social media comes to very quick decisions without all the facts."

81. The Defendants "threw Plaintiff under the bus" and did not "have her back," even though it failed to perform an investigation to determine whether "people (got) the facts right."

82. The Defendants would have performed an investigation before terminating the Plaintiff, but for Plaintiff's race.

83. Upon information and belief, the Defendants would not have made knowingly false statements about Plaintiff and about an investigation into the Plaintiff, but for Plaintiff's race.

84. The Defendants would not have terminated Plaintiff's employment but for Plaintiff's race.

85. The Defendants would not have relied exclusively on social media to determine the Plaintiff's discipline, but for the Plaintiff's race.

86. The Defendants would not have relied substantially on social media to determine the Plaintiff's discipline, but for the Plaintiff's race.

87. The Defendants would not have "thrown Plaintiff under the bus" by terminating and publicly shaming her, but for her race.

88. The Defendants would have "had the Plaintiff's back" and not terminated and publicly shamed her, but for her race.

89. Upon information and belief, the Defendants would have performed an investigation if the Plaintiff was a different gender.

90. Upon information and belief, the Defendants would not have made knowingly false statements about the Plaintiff and about an investigation into the Plaintiff if the Plaintiff was a different gender.

91. Upon information and belief, the Defendants would not have terminated Plaintiff's employment if the Plaintiff was a different gender.

92. The Defendants would not have relied exclusively on social media to determine the Plaintiff's discipline, but for the Plaintiff's gender.

93. The Defendants would not have relied substantially on social media to determine the Plaintiff's discipline, but for the Plaintiff's gender.

94. The Defendants would not have "thrown Plaintiff under the bus" by terminating and publicly shaming her, but for her gender.

95. The Defendants would have "had the Plaintiff's back" and not terminated and publicly shamed her, but for her gender.

96. The Defendant Jenny Johnson contrasted the Defendants' treatment of Vivek Kudva from its treatment of the Plaintiff in her July 15, 2021 interview with Yahoo! Finance.

97. The Defendants performed a thorough investigation into the allegations of wrongdoing against Vivek Kudva.

98. The Defendants did not terminate the employment of Vivek Kudva.

99. Upon information and belief, the Defendants did not discipline Vivek Kudva in any meaningful way.

100. The Defendants did not rely exclusively on social media to determine whether or not it would discipline Vivek Kudva.

101. The Defendants did not rely substantially on social media to determine whether or not it would discipline Vivek Kudva.

102. Not only did the Defendants not rely on social media to determine whether or not it would discipline Vivek Kudva, the Defendants have been outspoken about the danger of relying on social media in its defense of Vivek Kudva.

103. The Defendants did not "throw Vivek Kudva under the bus" but, rather, Defendants "have Vivek Kudva's back."

104. Upon information and belief, in 2013, Chuck Johnson joined Franklin Resources' board of directors, a position he held until February 2020.

105. Upon information and belief, Chuck Johnson is a male.

106. Upon information and belief, Chuck Johnson is a convicted felon who was incarcerated for two months.

107. Upon information and belief, in 2002, Chuck Johnson "slammed his wife into a kitchen stove hard enough to break the bones of her face." https://nypost.com/2020/05/30/the-firm-that-fired-amy-cooper-promoted-heir-who-beat-his-wife/

108. Upon information and belief, when Chuck Johnson joined Franklin Resources' board of directors, Franklin Resources knew of Chuck Johnson's criminal conviction and incarceration for physically hurting his wife.

109. C.K. is presently employed by the Defendants as an executive in the Financial Institutions group, and has been continuously employed by the Defendants since at least 2007.

110. C.K. is a Caucasian male.

111. The Plaintiff has made two complaints about C.K. while employed by the Defendants.

112. In or around 2016, the Plaintiff was at an industry conference and asked by a client whether she knew C.K. The client proceeded to tell the Plaintiff that C.K. had recently offended him and made him uncomfortable by sharing that he was recently divorced and insisting he wanted to go somewhere to meet women or to an adult entertainment venue.

113. The Plaintiff reported the client's allegation against C.K. to her manager.

114. Neither the Plaintiff's manager nor anyone else at Franklin Templeton followed-up with the Plaintiff.

115. Upon information and belief, the Defendants ignored the complaint about C.K.

116. Upon information and belief, C.K. received no discipline relating to the behavior reported by the Plaintiff.

117. Prior to that, also in 2016, the Plaintiff made a complaint to her manager and the Head of Product Management that the group managed by C.K. had plagiarized a competitor's presentation materials.

118. Management agreed that what happened was inappropriate and blatant plagiarism.

119. Despite agreement that what happened was inappropriate and blatant plagiarism, the Plaintiff was told to "keep it quiet."

120. Despite agreement that what happened was inappropriate and blatant plagiarism, upon information and belief, C.K. was not disciplined.

121. Despite agreement that what happened was inappropriate and blatant plagiarism, upon information and belief, no one on C.K.'s team was disciplined.

122. Upon information and belief, all of the members of C.K.'s team were Caucasian males.

123. On another occasion, the Plaintiff witnessed C.K. telling a story about making sexual advances on a hotel clerk to the Plaintiff's manager.

124. Upon information and belief, the Plaintiff's manager did not report this story, and no investigation was initiated or discipline issued.

125. In or around 2017, and upon information and belief, a complaint(s) was made by employees and/or interviewees of the Defendants that C.K. committed acts of sexual harassment in the workplace.

126. Upon information and belief, the Defendants performed no investigation into the allegations of sexual harassment made against C.K.

127. The Defendants did not terminate or otherwise discipline the employment of C.K. as a result of allegations of sexual harassment.

128. Not only has C.K. not been terminated or disciplined by the Defendants, the Defendants have promoted and given C.K. increased responsibility since complaints were made about C.K.

### f. The Destruction of Plaintiff's Life

129. Plaintiff's personal and professional life has been destroyed by the knowingly false statements made by Defendants.

130. As one example, the CFA (Chartered Financial Analyst) Institute initiated an investigation and disciplinary proceeding into the Plaintiff based on the Defendants' statements.

131. A true and accurate copy of the letter from CFA Institute providing Notice of Investigation is annexed hereto as Exhibit "B."

132. The Defendants knew or should have known their knowingly false statements would cause Plaintiff severe emotional distress.

133. Plaintiff did, in fact, suffer severe emotional distress because of the knowingly false statements of the Defendants.

134. Defendants received countless phone calls on May 25, 2020 from people seeking to make threats to and harass the Plaintiff on the basis of her race and/or gender.

135. Defendants' telephone system provided Plaintiff's personal cell phone number to people who called on May 25, 2020 seeking to make threats to and harass Plaintiff because of her race and/or gender.

136. By their telephone system providing people who called on May 25, 2020 seeking to make threats to and harass the Plaintiff because of her race and/or gender with the Plaintiff's personal cell phone number, the Defendants caused countless threatening and harassing phone calls and text messages to reach Plaintiff.

137. A representative text message sent to the Plaintiff's personal cell phone said: "You racist cunt bitch. Fuck that dog too, stupid bitch. You all over social media lying on a black man. Stupid typical white bitch."

138. The Plaintiff received dozens of other text messages like this one to the personal cell phone number provided by the Defendants.

139. The Defendants' actions caused her such severe emotional distress that she was suicidal.

<u>JURISDICTION AND VENUE</u>

140. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331, and pursuant to the principles of supplemental jurisdiction under 28 U.S.C. § 1367.

141. Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because the Southern District of New York is the judicial district in which at least a substantial portion of the events giving rise to Plaintiff's claims occurred.

## THE PARTIES

142. Plaintiff Amy Cooper is a white female. She was employed by the Defendants from June 2015 until her termination of employment on May 26, 2020. Plaintiff was an exceptional employee at Franklin Templeton, earning high performer bonuses in 2016, 2017 and 2018. In or about May 2019, Plaintiff was assigned increased Portfolio Manager and client account responsibilities. At all relevant times, Plaintiff worked primarily from the Defendants' location in New York, New York.

143. Defendants Franklin Templeton, Franklin Templeton Investments, Franklin Resources, Inc., and Franklin Templeton Companies, LLC is the Plaintiff's former employer, and is engaged in the business of financial services with a place of business located at 280 Park Avenue in New York, New York.

144. Defendant Jenny Johnson is, and at all times relevant was, the President and Chief Executive Officer of the Defendants Franklin Templeton, Franklin Templeton Investments, and/or Franklin Resources, Inc.

145. Defendants Franklin Templeton Corps. XYZ 1-10 represent corporate agents, successors and assigns, affiliates, subsidiaries, or divisions of the Defendants Franklin Templeton, Franklin Templeton Investments, and Franklin Resources liable for any or all claims contained herein, but whose name(s) or action(s) remains unknown.

146. Defendants John Does and/or Jane Does 1-10 represent individual agents or persons liable for any or all claims contained herein, but whose name(s) or action(s) remain unknown.

## FIRST COUNT AGAINST ALL DEFENDANTS
### Race Discrimination in Violation of § 1981

147. Plaintiff repeats and realleges all preceding allegations as if separately set forth again herein at full length.

148. The Defendants discriminated against the Plaintiff on the basis of her race, in violation of Section 1981.

149. As a result of the Defendants' discrimination, the Plaintiff has suffered substantial loss of earnings and benefits and endured severe emotional distress, and will continue to do so in the future. Accordingly, the Defendant is liable to the Plaintiff for back pay and bonus, loss of unvested funds and other benefits, front pay or reinstatements, emotional distress damages, attorneys' fees and costs, and interest and punitive damages in an amount to be determined at trial.

## SECOND COUNT AGAINST ALL DEFENDANTS
### Race and Gender Discrimination Under the New York State Human Rights Law

150. Plaintiff repeats and realleges all preceding allegations as if separately set forth again herein at full length.

151. Plaintiff was an "employee" for purposes of § 296 of the New York State Human Rights Law.

152. The Defendants is/are an "employer" for purposes of § 296 of the New York State Human Rights Law.

153. Defendants unlawfully discriminated against the Plaintiff on the basis of her race and sex in violation of § 296, et seq. of the New York State Human Rights Law.

154. As a result of the Defendants' unlawful discrimination, the Plaintiff has suffered substantial loss of earnings and benefits and endured severe emotional distress, and will continue to do so in the future. Accordingly, the Defendants are liable to the Plaintiff for back pay and bonus, loss of unvested funds and other benefits, front pay or reinstatements, emotional distress damages, attorneys' fees and costs, and interest and punitive damages in an amount to be determined at trial.

<u>THIRD COUNT AGAINST ALL</u>
<u>DEFENDANTS</u>

**Race and Gender Discrimination Under the New York City Human Rights Law**

155. Plaintiff repeats and realleges all preceding allegations as if separately set forth again herein at full length.

156. Plaintiff is a "person" as that term is defined by the New York City Human Rights Law § 8-102(1).

157. The Defendants is/are an "employer" as that term is defined by the New York City Human Rights Law § 8-102(5).

158. Defendants unlawfully discriminated against Plaintiff on the basis of her race and gender in violation of the New York City Human Rights Law § 8-107(2).

159. As a result of the Defendants' unlawful discrimination, Plaintiff has suffered substantial loss of earnings and benefits and endured severe emotional distress, and will continue to do so in the future. Accordingly, the Defendants are liable to the Plaintiff for back pay and bonus, loss of unvested funds and other benefits, front pay or reinstatements, emotional distress damages, attorneys' fees and costs, and interest and punitive damages in an amount to be determined at trial.

160. Defendants' discriminatory conduct was made with reckless indifference to the rights of the Plaintiff, entitling the Plaintiff to punitive damages under the New York City Human Rights Law.


FOURTH COUNT AGAINST ALL DEFENDANTS
**Defamation Under New York State Common Law**

161. Plaintiff repeats and realleges all preceding allegations as if separately set forth again herein at full length.

162. Statements made by the Defendants in the May 26, 2020 Twitter statement were false.

163. Statements made by the Defendants in the June 2, 2020 video interview with *Bloomberg* were false.

164. Statements made by the Defendants in the July 6, 2020 video interview with *Fortune* were false.

165. The Defendants knew that statements contained in the May 26, 2020 Twitter statement were false.

166. The Defendants knew that statements contained in the June 2, 2020 video interview with *Bloomberg* were false.

167. The Defendants knew that statements made in the July 6, 2020 video interview with *Fortune* were false.

168. The false statements made by the Defendants in the May 26, 2020 Twitter statement were published to third parties.

169. The false statements made by the Defendants in the June 2, 2020 video interview with *Bloomberg* were published to third parties.

170. The false statements made by the Defendants in the July 6, 2020 video interview with *Bloomberg* were published to third parties.

171. The false statements made by the Defendants in the May 26, 2020 Twitter statement caused special harm to Plaintiff.

172. The false statements made by the Defendants in the June 2, 2020 video interview with *Bloomberg* caused special harm to Plaintiff.

173. The false statements made by the Defendants in the July 6, 2020 video interview with *Bloomberg* caused special harm to Plaintiff.

174. As a result of the Defendants' defamation, the Plaintiff has suffered substantial loss of earnings and benefits and endured severe emotional distress, and will continue to do so in the future. Accordingly, the Defendants are liable to the Plaintiff for back pay and bonus, loss of unvested funds and other benefits, front pay or reinstatements, emotional distress damages, attorneys' fees and costs, and interest and punitive damages in an amount to be determined at trial.

FIFTH COUNT AGAINST ALL DEFENDANTS
**Defamation *Per Se* Under New York State Common Law**

175.  The Plaintiff repeats and realleges all preceding allegations as if separately set forth again herein at full length.

176. Statements made by the Defendants in the May 26, 2020 Twitter statement were false.

177. The statements made by the Defendants in the May 26, 2020 Twitter statement tends to injure plaintiff in her trade, business, or profession.

178. Statements made by the Defendants in the June 2, 2020 video interview with *Bloomberg* were false.

179. The statements made by the Defendants in the June 2, 2020 video interview with *Bloomberg* tends to injure Plaintiff in her trade, business, or profession.

180. Statements made by the Defendants in the July 6, 2020 video interview with *Fortune* were false.

181. The statements made by the Defendants in the July 6, 2020 video interview with *Fortune* tends to injure Plaintiff in her trade, business, or profession.

182. The Defendants knew that statements contained in the May 26, 2020 Twitter statement were false.

183. The Defendants knew that statements contained in the June 2, 2020 video interview with *Bloomberg* were false.

184. The Defendants knew that statements made in the July 6, 2020 video interview with *Fortune* were false.

185. The false statements made by the Defendants in the May 26, 2020 Twitter statement were published to third parties.

186. The false statements made by the Defendants in the June 2, 2020 video interview with *Bloomberg* were published to third parties.

187. The false statements made by the Defendants in the July 6, 2020 video interview with *Fortune* were published to third parties.

188. As a result of the Defendants' defamation *per se*, Plaintiff has suffered substantial loss of earnings and benefits and endured severe emotional distress and will continue to do so in the future. Accordingly, the Defendants are liable to Plaintiff for back pay and bonus, loss of unvested funds and other benefits, front pay or reinstatements, emotional distress damages, attorneys' fees and costs, and interest and punitive damages in an amount to be determined at trial.

## SIXTH COUNT AGAINST ALL DEFENDANTS
**Intentional Infliction of Emotional Distress Under New York State Common
Law**

189. Plaintiff repeats and realleges all preceding allegations as if separately set forth again herein at full length.

190. The Defendants' announcements to the effect that they had conducted an investigation, and that the investigation concluded indisputably that the Plaintiff was a racist when Defendants knew they had not conducted an investigation which concluded indisputably that the Plaintiff was a racist, was extreme and outrageous.

191. The Defendants' announcements to the effect that they had conducted an investigation, and that the investigation concluded indisputably that the Plaintiff was a racist when Defendants knew they had not conducted an investigation which concluded indisputably that the Plaintiff was a racist, was done with a disregard of a substantial likelihood of causing severe emotional distress.

192. The Defendants' announcements to the effect that they had conducted an investigation, and that the investigation concluded indisputably that Plaintiff was a racist caused the Plaintiff to suffer severe emotional distress.

193. As a result of the Defendants' intentional infliction of emotional distress, Plaintiff has suffered severe emotional distress and will continue to do so in the future. Accordingly, the Defendants are liable to the Plaintiff in an amount to be determined at trial.

<u>SEVENTH COUNT AGAINST ALL DEFENDANTS</u>
**Negligence Under New York State Common Law**

194. Plaintiff repeats and realleges all preceding allegations as if separately set forth again herein at full length.

195. The Defendants owed Plaintiff a duty to not facilitate harm, threats and harassment based on race and gender from third parties to Plaintiff.

196.  The Defendants breached its duty to Plaintiff by their telephone system providing Plaintiff's personal cell phone number to people calling to make threats and harassment based on race and gender.

197.  The Defendants' breach of its duty was a proximate cause of Plaintiff suffering severe emotional distress caused by people calling Plaintiff's personal cell phone number to make threats and harassment based on race and gender.

198.  As a result of the Defendants' negligence, Plaintiff has suffered severe emotional distress and will continue to do so in the future. Accordingly, the Defendants are liable to Plaintiff in an amount to be determined at trial.

Dated:  September 22, 2021

Law Office of Andrea Paparella, PLLC

-and-

Litt Law, PC

*Attorneys for Plaintiff*

By:

_____

Pandemic Address:
4 Dunlap Street
Salem, MA 01970
Telephone: (617) 680-2400
Facsimile: (914) 462-3287
Email: amp@andreapaparella.com


-and-

789 Farnsworth Ave.
Bordentown, NJ  08505
Telephone: (908) 902-7071 Email:
MLitt@LittLaw.Net

# EXHIBIT "A"

From: Jerome Lockett <JeromeLockett@gmail.com>
Date: May 26, 2020 at 07:09:52 EDT
To: "Goldstein, Julie (NBCUniversal)" <Julie.Goldstein@nbcuni.com>
Cc: "Walker, Hayley (NBCUniversal)" <Hayley.Walker@nbcuni.com>
Subject: Re:  NBC News / TODAY Show Inquiry


Hey Julie,


Thank you for getting back to me. Of course, I wouldn't mind my statement be put somewhere. The below can be published wherever of your choosing.

—————-

I'm a 30 year old African American dog owner living in NYC. I frequently take my dog to Central Park and walk my dog with my friend and his dog (he's a white man).


[Central Park allows dogs off-leash before 9:AM and after 9:PM there are a few parts of the park that don't allow dogs off-leash, no matter the time, the Ramble being one of them]


My friend tells me about a month ago as we're approaching the Ramble with our dogs off-leash, "a few days ago there was a dude in their screaming a people to leash their dog. I'm glad that other owner was with me because he's a really buff dude waving his helmet."


I make nothing of it because sometimes people tell us to leash our dogs, but we're just passing through quickly and we don't allow our dogs to go chasing birds or anything so what's the barn? Sure it's a rule, but a rule tons of dogs owners frequently break, especially if we're just quickly walking through.


Well, a few days later we're in there and Christian (had no idea his name or that this was the same guy my friend mentioned to me days ago) comes yelling from about 10 yards away "YOU NEED TO LEASH YOUR DOG!!! THEY CAN'T BE OFF-LEASH IN HERE." We both take a few steps back and my friend ask him if he works for the park and he says no. So we say "sounds good, have a good one." And when we turn our back he starts to try and make these noises to call our dogs to him.


I yelled, "don't try and call my dog to you!" He then says, "if you're gonna do what you want, them I'm not gonna do what I want, but you're not gonna like it."


Me: What?? Are you threatening me and my dog??

Christian: *bends down, while gripping his black (Vespa?) helmet attached to his side and starts calling my dog by clapping* and say "come here puppy! Come here!"

I then ran over to him and pushed him away before he got too close to my dog. He then yelled for someone to record it, but the two white men he was with seemed uninterested. I said "never fucking touch someone's dog that isn't threatening you and never threaten me again." Then I walked away with my dog, my friend and his dogs.

As a black man, I am not scared of another person because their race or ethnicity, but this man IS threatening with his body language and screaming. I don't know Amy Cooper at all, I've said hello to her because that's what dog owners do to other owners in the park, but when I saw that video, I thought, I cannot imagine if he approached her the same way how she may have genuinely been afraid for her life. She may not be like me willing to physically defend herself or her dog. I understand the optics of this video aren't great, but people need to understand this man is a dick and probably did threaten her. You can read his Facebook post where he tells the world he told her "you're not gonna like what I'm going to do next." That's a threat. And she has no idea if this man is pulling out a knife, a gun, or a treat that laced with a rat poison. If I wasn't who I was, I would of called the police on that guy too. Sure, we're breaking the rules by having our dogs off leash in a park that has 80% of its area off-leash hours, but that gives that guy no authority to accost people in such manner.

My two fellow dog owners have had similar situations with this man, but don't feel comfortable coming forward because they're white. They think they'll be seen as some "Karen" or whatever. I obviously don't have that fear. I am a liberal man who voted for Barack, Bernie, and Bernie again. I'll be voting for Biden as he's the lesser of two evils. I'm not some right wing nut job trying to push an agenda. I just think it's unfair and uncool how the world is pushing their own agenda with this story. Not everyone has a personal experience like this so I get it because of the optics, but I beg you guys to please publish my words. This is not the story we all want.

Thank you guys for your time.

-Jerome Lockett

EXHIBIT "B"



915 East High Street
Charlottesville, VA
22902-4868 USA

+1 (434) 951 5499 tel
+1 (434) 951 5262 fax
info@cfainstitute.org
www.cfainstitute.org

17 June 2020

**PERSONAL AND CONFIDENTIAL**
**Via FEDEX and EMAIL:**  a2cooper@hotmail.com

Amy M. Cooper, CFA
160 Riverside Blvd, Apt 301
New York, NY  10069

**Notice of Investigation**

Dear Ms. Cooper:

This letter is to notify you that Professional Conduct has opened an investigation into the incident in Central Park that resulted in the termination of your employment at Franklin Templeton to determine whether there were any violations of the CFA Institute Code of Ethics and Standards of Professional Conduct.  Pursuant to that investigation, we request that you provide the following documents and information *within 10 days of the date of this letter:*

1) At the time of the incident in Central Park, did you have a written employment contract with Franklin Templeton?  If so, please provide a copy.  (You may redact any confidential personal information such as your social security number, account numbers, etc.);

2) During your employment at Franklin Templeton, did you receive any written complaints or warnings?  If "yes," please provide copies;

3) Please produce copies of all documents and correspondence (including emails) exchanged between you (or your attorneys) *and Franklin Templeton* regarding the incident in Central Park and/or your termination;

4) Provide copies of all firm policies, procedures, codes, and/or standards mentioned or cited by Franklin Templeton in connection with the incident in Central Park and/or your termination;

5) Please produce copies of all documents and correspondence (including emails) exchanged between you (including your attorneys) *and any criminal or government authorities* regarding the incident in Central Park and/or your termination of employment;

6) Please provide a current email address where you can be reached.  If this address (or any of your other contact information) changes during this investigation, you must log into your account at www.cfainstitute.org and make the necessary updates as soon as possible.  Because of security restrictions, Professional Conduct cannot change this information on your behalf—you must make all changes through your CFA Institute account; and



7) Please feel free to provide any additional documents or information that you believe would be relevant or useful in our investigation.

Before you become subject to a confidential settlement agreement or protective order regarding any matter we are investigating, you must request a "carve out" provision that provides us with access to the agreement and any documents or information we may need in connection with our investigation.

Finally, please note that our investigation, and any resulting disciplinary proceeding, will be governed by the 2017 Rules of Procedure: Matters Related to Professional Conduct.  Additional information concerning our investigative process and copies of the Code and Standards, Bylaws, and Rules of Procedure may be found at:  Professional Conduct Program.

If you have any questions about this letter, please contact me at jeffrey.stith@cfainstitute.org.

Sincerely,

*Jeffrey K. Stith*

Jeffrey K. Stith
Head, Enforcement
Professional Conduct